# Mark S. DeMarco
Attorney At Law
100 Lafayette Street, Ste. 501
New York, New York 10013
718 239 7070
Fax 718-239-2141
MSDLaw@aol.com

August 14, 2024

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
Eastern District of New York
Long Island Courthouse
100 Federal Plaza
Central Islip, NY 11722

**BY ECF & ELECTRONIC MAIL**

              Re: *United States v. Rigel Velasquez-Mancia*
                 **21 Cr. 635 (JMA)**

Your Honor:

**Introduction**

  Rigel Yohario Velasquez-Mancia Rigel is twenty-three years old. He grew up "dirt poor" in Volcancillo San Marcos, Honduras, a small village of approximately 100 people, where he was raised with his mother, maternal grandparents, and cousins sharing a small wooden home with a dirt floor, no electricity, an outhouse, and outdoor plumbing. There were two beds made of wood pallets covered with mattresses.[1]

  Rigel's grandfather, Armando Carbajal, worked in the fields, growing corn and beans, and was able to adequately provide for the family. While his parents had a good relationship, his father Javier, who wanted to provide a better life for his family – a good home with a cement floor and indoor plumbing and a decent education – left Honduras when Rigel was five-years-old and came to the United States where he earned enough money to build his family a home and send his children to school. Rigel lived with his grandparents until he was 12 when he moved with his mother and younger brother into the house built with his father's earnings. This home had a concrete floor, brick walls, indoor plumbing, electricity, and a metal roof.

  In 2017, after the birth of his younger sister, Rigel knew the family would need more financial support and decided to join his father in the U.S. so he could also earn money to help

---

[1] An exhaustive mitigation investigation was conducted on Mr. Velasquez-Mancia's behalf. Much of the information contained herein is based on the interviews conducted and the records procured by the mitigation specialist.

1

Hon. Joan M. Azrack
August 14, 2024

support his family. He risked his life by riding the freight trains through Honduras, Guatemala, and Mexico to the United States so he could be with his father and work to make money to send home to his family in Honduras. After two unsuccessful attempts resulting in his deportation back to Honduras, Rigel finally arrived in the United States.

Each journey was treacherous. On each occasion, he departed Honduras with a group of people from the local community. Migrants rode on top of the freight trains. Many fell off the trains by falling asleep or slipping. Gangs would also prey upon passengers. Rigel saw people assaulted, pushed off trains and robbed. Groups of young men would attack the trains at night, hopping on when they slowed down. News of their boarding quickly spread through the passengers since these attacks were common. People laid down and tried to cover themselves, while others scrambled to hide. Rigel saw the first victim assaulted with machetes and watched in horror as the victim's arm was cut from his body. He heard people screaming and witnessed many jump off the trains to escape. Although Rigel was only robbed once and soon learned how to evade the gangs, he witnessed numerous other assaults and robberies, including one that seared a lasting memory in his mind of several men repeatedly kicking and punching a man into unconsciousness.

On August 4, 2018, Rigel was detained by U.S. Border Patrol agents as he was crossing the Rio Grande River into El Paso, Texas. He immediately admitted that he had entered the country illegally and was processed as a Warrant of Arrest/Notice to Appear. It was determined that he would remain at the Border Patrol Station in Clint, Texas until placement was determined. Rigel provided officers with his father's name and contact information in Far Rockaway, New York. A flight to New York was secured by a social services agency and on October 13, 2018, Rigel was reunited with his father, who he hadn't seen in 13 years.

Rigel lived with his father in Far Rockaway and began attending Frederick Douglass High School in October 2018. He was discharged in May 2019, to a part-time program which he failed to attend so that he could work full-time with his father.

Rigel's conviction here is his first and, with the exception of being detained after crossing into the United States, he has never spent a day in jail prior to his arrest.[2]

---

[2] Following his arrest this case by the NYPD on April 15, 2021, Rigel was placed at Rikers Island, in the custody of the New York City Department of Correction, where he remained until April 13, 2022. While at Rikers, he was assaulted with sharp edged weapons on two occasions. The first time he was mistakenly associated with another Hispanic male who was the target of the Crip gang members. He was standing next to this man, when two assailants walked by and Rigel was slashed with a box cutter across his left check, dangerously close to his eye. He received eighteen stitches and is left with a very visible scar.

On the second occasion, five men came into his cell at two o'clock in the morning. He recalls waking up and seeing these men going through his property. He got up from his bed and was punched in the face, then slashed several times on both his arms when he raised them to defend himself. He managed to grab his blanket and wrap it over his upper body, as he burst from his cell and ran across the unit to the gate, where a guard opened the door and allowed him to

Hon. Joan M. Azrack
August 14, 2024

      Accordingly, this letter is submitted to provide information to assist this Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment for Mr. Velasquez-Mancia, who, on November 28, 2023, appeared before this Court and pleaded guilty to Count One of the Indictment. He is scheduled to be sentenced by Your Honor on September 4, 2024.

      Rigel has expressed true, heartfelt remorse for his actions in connection with this indictment and, since our very first meeting, he has acknowledged his guilt for the charged crime and, from the earliest stages of the case, defense counsel informed the government of his intent to plead guilty and accept responsibility for the charged conduct. With little hesitation, Rigel entered a timely plea of guilty.

      Rigel Velasquez-Mancia, a 23-year old young man who has endured a difficult childhood, now faces a substantial prison sentence. His difficult childhood and upbringing have, in this writer's opinion, contributed significantly to his current situation. At the outset, it must be noted that neither Rigel nor his attorneys are attempting to minimize the seriousness of his offenses. Indeed, Mr. Velasquez-Mancia understands the significant effect his conduct had on the victim's family and community and acknowledges that this Court must sentence him to a lengthy term of imprisonment. Nevertheless, this memorandum is submitted to paint a picture of the man that this Court will be sentencing.

      We respectfully submit that these circumstances warrant a sentence below the advisory guideline range, an appropriate sentence which satisfies the objectives embodied in *Booker* and *§ 3553(a)*.

**Application of the Section *3553(a)* Factors Calls for a**
**<u>Sentence Well Below the Advisory Guidelines Range</u>**

      <u>*18 U.S.C. § 3553(a) Factors*</u>

      Pursuant to the Supreme Court's decision in *United States v. Booker*, the Guidelines are advisory; a sentencing court may depart in the interest of justice as well as in light of other statutory concerns as expressed in section 3553(a). *United States v. Booker*, 543 U.S. 220, 245-46, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005); see also *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("It is now, however, emphatically clear that the Guidelines are guidelines — that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.").

      A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). If the sentence is not of the kind prescribed by, or is outside the range of, the Sentencing Guidelines referred to in section 3553(a)(4) of title 18, the court shall indicate the specific reasons for imposing a different sentence. See 18 U.S.C. § 3553(c)(2). These

---

escape. He has no idea why his cell door was open at that time.

Hon. Joan M. Azrack
August 14, 2024

"reasons must also be stated with specificity in a statement of reasons form." Id.  Even though the Guidelines are now advisory rather than mandatory, *Booker*, 543 U.S. at 245-46, the sentencing court must still adhere to the requirements of 18 U.S.C. § 3553(c)(2). *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006). The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006), abrogated in part on other grounds by *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007). The statement should demonstrate that the court "'considered the parties' arguments' and that it has a `reasoned basis for exercising [its] own legal decision making authority.'" *Cavera*, 550 F.3d at 193 (quoting *Rita v. United States*, 551 U.S. 338, 356, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007)).

In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society, and our economy, parsimony in incarceration is prized. See, e.g., 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary."); National Research Council of the National Academies, The Growth of Incarceration in the United States, Exploring Causes and Consequences, 8 (2014) ("Parsimony: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

Accordingly, a court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of the Guidelines. *18 U.S.C. § 3553(a)*. The Guidelines range is the "starting point and the initial benchmark." *United States v. Johnson, 567 F.3d 40, 51 (2d Cir. 2009) (quoting Gall v. United States, 552 U.S. 38 (2007))*. "A district court is authorized to depart from a Guidelines range if the court finds that 'there exists an aggravating or mitigation circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *United States v. Juvenile Male Po, 466 Fed. Appx. 14, 15 (2d Cir. 2012) (summary order) (citing 18 U.S.C. § 3553(b))*.

**The Sentencing Factors As Applied to Rigel Velasquez-Mancia**

*18 U.S.C. § 3553(a),* and *United States v. Crosby*, *397 F.3d 103 (2d Cir. 2005)*, outline the task facing district courts in considering the guidelines.  The court must determine the applicable guidelines range, and further consider applicable policy statements.  After thus considering the guidelines, the Court must consider all the other factors set forth in *§ 3553(a)* before determining whether (i) to impose the sentence that would have been imposed under the guidelines, i.e. a sentence within the applicable guideline range or within permissible departure authority, or (ii) to impose a non-guideline sentence.

Hon. Joan M. Azrack
August 14, 2024

**<u>Incarceration at the MDC Brooklyn</u>**

Since April 2022, Rigel has been incarcerated at the Metropolitan Detention Center (MDC) in Brooklyn, the conditions of which are well known to the Court. Judge Colleen McMahon described the MDC as "disgusting" and "inhuman," see Sentencing Transcript at 19-21, *United States v. Days*, Case No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021) (ECF No. 35), and Judge Cheryl L. Pollak described it as a "third world country" prison. *See* https://www.nydailynews.com/2016/10/07/exclusive-judge-refuses-to-send-women-to-brooklyn-jail-with-third-world-conditions/.

Earlier this year, Judge Jesse Furman had the following to say about the conditions at the MDC:

> In the winter of 2019, a power outage left inmates without light or heat for a full week while a polar vortex swept the East Coast. Since that time, the dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care. Contraband – from drugs to cell phones – is widespread. At least four inmates have died by suicide in the last three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

*United States v. Chavez*, Case No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024) (internal footnotes omitted).

The Court ultimately held that "the conditions at the MDC constitute 'exceptional reasons' why detention of most defendants who do not pose a risk of flight or danger to the community … 'would not be appropriate'" Id. at *8 (citation omitted).

Further, as Judge Brown noted in *United States v. Colucci*, Case No. 23-CR-417 (GRB), 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024), the determination of sentence " is further complicated by an extrinsic factor that looms large in nearly every bail and sentencing determination made in this judicial district: the dangerous, barbaric conditions that have existed for some time at the" MDC, where:

> Chaos reigns, along with uncontrolled violence. *Griffin*, 2024 WL 2891686 at *3 (describing rampant "violence and the threat of violence" at MDC). Through review of sealed documents, official government statements, judicial opinions and news media reports, this Court has identified shocking instances of brutal violence within the facility. This review is necessarily limited, as the Court's access to relevant information was exceptionally narrow. In other words, there were, most certainly, other incidents not collected during this Court's review. Nevertheless, the results are staggering.

5

Hon. Joan M. Azrack
August 14, 2024

> Each of the five months preceding this opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim. One knife attack was captured on a surveillance video producing images that are horrifying beyond words. The activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries: drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as yet-unidentified "brawls."

*United States v. Colucci*, Case No. 23-CR-417 (GRB), 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024)

### Mr. Velasquez-Mancia's Background

### Personal and Family History

Rigel Yohario Velasquez-Mancia was born in Honduras on October 25, 2000, the first of two sons born through the non-marital union between Javier Amilcar Velasquez Garcia and Maura Isabel Mancia.

Rigel was raised under extremely poor conditions, sharing a small wooden home with a dirt floor, no electricity or indoor plumbing with at least 12 family members. In order to provide for the family, Rigel's father immigrated to the United States when Rigel was only five years old, where he earned enough money to provide the family with a brick home with concrete floors, electricity, indoor plumbing and a metal roof.

In 2017, when his sister was born, Rigel decided to join his father in the United States so that he could provide financial support for his family. After several unsuccessful attempts to enter the United States, Rigel finally joined his father in New York in October 2018, after spendcing several months in an immigration detention center in Texas.

Indeed, Rigel is a man who has always placed his family before himself. He is a devoted son and sibling, who risked his life coming to the United States so that he could provide for his family in Honduras. As his maternal aunt writes:

> He is my nephew on his mother's side. I describe him as a child that I feel I know as well as [I would] a son. My opinion regarding Rijel is that I always knew him to be a child apart, devoted to chores to help his maternal grandparents with whom he lived sharing a part of his life. He went to school. His teachers are my work mates. They see him as a child of humble and polite character. I don't think that he, after learning this lesson, will want to break the law in the future. He is a boy who can bring much to society, helping young men such as himself, who because of circumstances in life get involved in cases of wrongfulness.

* * *

Hon. Joan M. Azrack
August 14, 2024

> I am going to tell you a little about Rijel's life. He studied up to the second year of a career in a Christian boarding school, from which he left in order to see a better life, because in our country there aren't many opportunities for the young. He liked soccer. Sometimes we went out together for a birthday celebration. Every time I asked him for support in something, he helped me out. I just ask that Rijel be given a chance. There's a God that knows more than us humans. I dream of seeing him and being able to embrace him some day not too far away. My father, who is almost 80 years old asks me about him, Honorable Judge. Rijel is a good young man. I never saw any violence in him. On the contrary, he is a loving person. I hold him in such high esteem, to me he is more than a nephew: he is like my son, and I only want what is best for him.

**Defendant's Exhibit A, Letter of Hilda Alicia Mancia, Translated from Spanish to English by Official Court Interpreter J. Carlos Venant.**

Rigel attended school for less than a year before deciding to work full time with his father, who presently resides in Far Rockaway with Rigel's younger brother. Rigel's mother remains in Honduras.

Rigel has never been married and he has no children.

### Mental and Emotional Health

Rigel reports having recurring nightmares about riding the trains from Honduras in which he hears people screaming and disappearing in the darkness. He often wakes up in a cold sweat and breathing heavily. It appears that he suffers from undiagnosed PTSD based on his experiences riding the trains from Honduras and his time at Rikers Island. However, he has no history of mental health treatment.

### Educational and Vocational History

Rigel attended Arbol de Vida (Tree of Life), in Valle Magdalena, La Jigua Copan, Honduras in the 10th Grade for the academic year 2016. He was studying to become a marketing technology technician and completed course in Administration, Biology, Basic Accounting, Ecology, Spanish, Statistics, Physics 1, Foreign Language, Mathematics, Marketing Technology, Chemistry and Sociology.

As stated above, he began attending Frederick Douglas High School in Far Rockaway, as a freshman, on October 17, 2018. He left school in 2019 to work full time with his father. Rigel initially worked with his father in construction on the weekends but began working full-time after he left school in May 2019. He was paid in cash and also worked in landscaping.

Hon. Joan M. Azrack
August 14, 2024

### Rigel's Post-Arrest Conduct

Since his incarceration, Rigel has been a gentleman and a respectful inmate. He has maintained a low-profile at the MDC and has incurred only one disciplinary infraction.

More importantly, it must again be emphasized, and this Court should be aware, that Rigel has expressed true, heartfelt remorse for his actions.

### Conclusion

In this case, Rigel has taken a crucial first step – recognizing that he made a horrendous mistake in judgment by engaging in horrible criminal activity. Upon his release from prison, he will still have a chance to make something of himself. He is only 23 years old and does not have the heavy responsibilities that come with young children. He wants to improve himself, and has shown it to the extent he can during the many months of his incarceration without amassing a significant disciplinary record.

Above all, Rigel is remorseful. The heavy penalty he faces has driven home the futility of persisting with the poor choices he made that got him here. He has addressed to counsel how he wants to better himself as a person. He wants to learn English, obtain an education, find employment and not be judged for his past history and his past mistakes.

Accordingly, we urge Your Honor to give effect to the statutory admonition embodied in § 3553(a) by imposing a sentence significantly less than that suggested by the United States Sentencing Guidelines.

Thank you for your attention to this matter.

                                                    Respectfully submitted,

                                                    *Mark S. DeMarco*

                                                    Mark S. DeMarco
                                                    Elizabeth Macedonio
                                                    Attorneys for Rigel Velasquez-Mancia

cc:    John J. Durham, Esq.
        Justina L. Geraci, Esq.
        Paul G. Scotti, Esq.
        Assistant United States Attorneys
        By Electronic Mail